**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Kuy Volland, | ) | No. CV-10-02745-PHX-GMS |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Mobile Mini, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. 55) and Plaintiff's Motion to Strike the Declaration of Katherine Callaway (Doc. 63). For the reasons stated below, both motions are denied.

## BACKGROUND

Plaintiff, an Asian-American woman, alleges that Defendant, a national publicly-traded company headquartered in Tempe, Arizona that leases and sells portable storage containers and related devices, subjected her to a hostile work environment and retaliated against her when she complained that her supervisor made racially and sexually demeaning remarks. (Doc. 1).

On October 8, 2007, Plaintiff began working for Defendant as its National Accounts Manager. (Doc. 56 ¶ 17). She reported to Paul Widner, who was Defendant's Vice President of Sales and Development. (*Id.* ¶ 20). In December of 2007, Nicholas Scirghio replaced Widner as the Vice President of Sales and Development, and Plaintiff then reported to

Scirghio. (*Id.* at 21). On December 23, 2005, in response to earlier complaints, Scirghio had been issued a written warning that stated "[a]ny repeated complaints of the above issues will lead to further discipline up to and including suspension, demotion, or termination." (Doc. 61-3, Ex. H).

In anticipation of acquiring a competitor, Defendant undertook several broad reorganization efforts in early 2008, overseen by Mark Graham, Defendant's Director of Professional Development. (Doc. 56 ¶ 35). As part of the reorganization, Defendant created a National Account Support Center. (*Id.* at 37). In addition, the position of National Accounts Manager, held by Plaintiff, was eliminated, and a new position, National Accounts Support Center Manager, was created. (*Id.* at 38). Graham informed Plaintiff of the changes personally on April 3, 2008, and while Plaintiff took the news calmly, she stated that she did not understand why she was not automatically selected to be the National Accounts Support Center Manager. (*Id.* at 41). On April 8, 2008, Scirghio sent an email to the Branch Managers and the Branch Office Managers, copying Graham, announcing a number of new positions, including the National Account Support Center Manager. (Doc. 56-3, Ex. 7(B)). The email stated that Defendant's preference is to "promote from within," and stated that anyone interested in a position should email Graham or Scirghio. (*Id.*).

Plaintiff applied for the position of National Account Support Center Manager; she also approached Katherine Callaway, Defendant's Vice President of Human Resources and Risk Management. (Doc. 56-2, Ex. 2 at 98). According to Callaway, the two met "a couple of times." (*Id.* at 101). During the meetings, Plaintiff expressed her belief that "it was discrimination that [Scirghio] did not have to re-apply for his job but she had to re-apply for her job." (*Id.*). During that meeting or another meeting with Callaway, Plaintiff reported that Steve Bunger, the President and CEO of Defendant, had spoken with Scirghio about Asian reflexology massage, and that Bunger had made a joke about receiving a "happy ending" at the end of the massage. (*Id.* at 107). When meeting with Plaintiff before Plaintiff was interviewed for the position, Callaway "advise[d] her to wait until after her interview to see what happened," rather than make a formal complaint. (*Id.* at 100). Callaway believed that

- 2 -

1  Plaintiff would be hired for the position, and told Plaintiff so. (*Id.* at 102). She acknowledged in her deposition that one reason she did not investigate the allegation that Scirghio had participated in the telling of a racially and sexually offensive joke was that if she did, "[i]t may have affected [Plaintiff]'s employment in some way or another," and that Callaway "really wanted [Plaintiff] to have an unbiased shot at that position." (*Id.* at 146).

Plaintiff was interviewed for the position by Scirghio and Graham. (Doc. 55 ¶ 113). Another internal applicant, Mary Gaskin, was interviewed only by Graham. (*Id.* ¶ 114). Gaskin was offered the position of National Account Support Center Manager on April 11, 2008. (*Id.* ¶ 130). Plaintiff again met with Callaway, and stated that she believed she had not received the job because Scirghio had retaliated against her, and that Scirghio had engaged in "inappropriate behavior." (Doc. 56-2, Ex. 2 at 109–10). On April 14, Scirghio emailed Plaintiff, asking her to "list for me all the duties you perform in your roll [*sic*]," and requesting that she describe the duties of newly-created positions that would be reporting to Gaskin. (Doc. 61-4, Ex. O). Volland responded, but when asked to train someone hired for the newly-created position, she again approached Callaway. Callaway emailed Scirghio, stating that asking Plaintiff to train Gaskin and those who would report to Gaskin was "belittling" because "on one hand she isn't good enough for the job, but on the other hand you want her to do the job." (Doc. 6-14, Ex. P). Scirghio responded that "it is obvious to me that we made the right choice with Mary just base [*sic*] on [Plaintiff]'s actions over the past few days." (Doc. 61-4, Ex. N). Gaskin herself describes the position that Plaintiff originally held as "the position I pretty much think I took." (Doc. 61-3, Ex. F at 69).

Plaintiff was offered a severance agreement on April 16, 2008, which offered her two weeks pay in exchange for a waiver of any claim of discrimination or retaliation. (Doc. 56-3, Ex. 7(E)). Plaintiff declined to sign the agreement and received no severance. (Doc. 56 ¶ 147–48). Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") which found on August 31, 2010 that she had been retaliated against by being asked to sign a severance agreement containing unlawful provisions. (Doc. 61-4, Ex M). The EEOC made no finding on any other charge. (*Id.*).

1    In July of 2008, Gaskin complained to Graham that Scirghio regularly engaged in sexual innuendo at work, favored attractive female employees over others, and engaged in otherwise inappropriate behavior at work. (Doc. 61-3, Ex. F at 41). In November of 2008, after Scirghio attended a dinner with a number of employees as part of a team-building exercise, multiple employees complained that he had engaged in inappropriate behavior at the dinner. (Doc. 61-3, Ex. J). Defendant conducted an extensive investigation and a "Memorandum/ Employee Warning Report" was prepared and dated December 18, 2008. (Doc. 61-3, Ex. K). There is no evidence in the record of Scirghio receiving any other discipline based on the December 2008 investigation. (Doc. 61-2, Ex. A at 91).

Plaintiff filed this lawsuit on December 20, 2010. When Callaway was deposed, she stated that she did not know whether Defendant had a "zero-tolerance policy" with regard to sexual harassment, that she does not "work by consulting policy" but instead evaluates "the working relationship as a whole and the people within the relationship" and would use her "instinct and my intuition" rather than any written policy to determine whether someone needed to be disciplined. (Doc. 63-1, Ex. C at 26, 48). Subsequently she submitted a declaration that quotes extensively from Defendant's written sexual harassment policy. (Doc.63-1, Ex. A).

Defendant has moved for summary judgment on the merits of Plaintiff's suit, and Plaintiff has moved to strike Callaway's declaration. (Docs. 55, 63).

## DISCUSSION

### I.   Legal Standards

#### A.   Motion to Strike

When a party repudiates a previous deposition in a subsequent affidavit, the affidavit testimony cannot be relied upon to "'create' an issue of fact and avoid summary judgment." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). Nevertheless, "[a]ggressive invocation of the rule also threatens to ensnare parties who may simply have been confused during their deposition" and therefore the rule should be applied cautiously. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).

### B. Summary Judgment

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Issues of credibility, including questions of intent, should be left to the jury." *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (citations omitted). *See also Consol. Elec. Co. v. United States*, 355 F.2d 437, 438 (9th Cir. 1966) (reversing summary judgment and stating that "[w]hen an issue requires determination of state of mind, it is unusual that disposition may be made by summary judgment"). Because credibility determinations and motive are particularly important considerations in employment discrimination cases, the Ninth Circuit has held that "in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to full trial." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

## II. Analysis

### A. Motion to Strike

It is not proper to invoke the sham affidavit rule to strike Callaway's affidavit. The affidavit is not in fact in conflict with Callaway's deposition testimony. The portions of the affidavit to which Plaintiff objects detail Defendant's written anti-discrimination policy. The fact that such a policy exists does not contradict Callaway's statement that she does not work by consulting policy but instead evaluates whether or not one employee has sexually harassed another based on her intuition and instinct. (Doc. 63-1, Ex. C at 26, 48). In her statement of

facts in opposition to Defendant's motion, Plaintiff acknowledges as much, writing that she "admits that [Defendant] has accurately quoted its antidiscrimination policy, but DENIES that [Defendant] actually enforces the policy." (Doc. 61 ¶ 6) (emphasis in original). In evaluating Defendant's summary judgment motion, the Court will rely on all evidence submitted, including Callaway's affidavit and her deposition.

### B. Summary Judgment

Plaintiff alleges both that she was retaliated against for complaining about Scirghio's behavior and that she was subjected to a hostile work environment. These claims will be addressed in turn.

#### 1. Retaliation

Title VII "prohibits retaliation against an employee 'because [she] has opposed any practice made an unlawful employment practice'" by Title VII. *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1082 (9th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a) (2006)). Retaliation claims are evaluated under the familiar three-part test for Title VII claims established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of retaliation, an employee must show that "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). The Ninth Circuit "has explained that . . . 'the requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th Cir. 2002).

Once an employee establishes a prima facie case, the employer has the burden to put forward "legitimate, non-retaliatory reasons for any adverse actions taken." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464–65 (9th Cir. 1994). If the employer meets this burden, the employee then "has the ultimate burden of showing that [the employer's] proffered reasons are pretextual." *Id.* The plaintiff may do so by presenting either direct evidence or specific and substantial circumstantial evidence that the defendant's reason was

a pretext to retaliate against her. *See Villiarimo*, 281 F.3d at 1062; *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

### a.   Prima Facie Case

Plaintiff claims that she reported to Callaway in late 2007 and early 2008 that Scirghio had made sexually and racially offensive comments in the workplace, such as repeatedly referring to her as "China Doll," stating that "Asian women are supposed to be submissive," and suggesting that she should use her looks to advance her career. (Doc. 61 ¶ 175). According to Plaintiff, she made a total of three complaints; first Callaway told her to "brush off" Scirghio's behavior, but ultimately warned her that Plaintiff could lose her job if she continued to complain, and told her that others who had complained about Scirghio had subsequently lost their jobs. (Doc. 61 ¶¶ 178–87). Additionally, she states that she asked Scirghio to stop making such comments on multiple occasions, but that his response was to grin, laugh, or joke. (Doc. 61 ¶ 183). Defendant points to evidence which it claims suggests that Plaintiff did not make these early complaints, but acknowledges that for the purposes of summary judgment, it "accepts as true [Plaintiff's] allegations that she complained" prior to April 2008. (Doc. 55 at 6). Moreover, Callaway denies telling Plaintiff that she could lose her job over complaining, although subsequent discovery has revealed that two earlier women had in fact complained about Scirghio and he had received no punishment other than a written warning. (Doc. 33 at 120:4; 80:9–24).

Plaintiff was employed until April of 2008, at which point she was let go and offered severance on the condition that she not file a Title VII complaint. (Doc. 56-3, Ex. 7(E)). Defendants claim that Plaintiff's position was eliminated and replaced with a substantively different position, but the internal candidate who took that position described it as Plaintiff's previous position. (Doc. 61-3 at 69:17–20). Defendant claims that Scirghio played no role in selecting another candidate over Plaintiff for the position, and that the person who did select the other candidate had no way of knowing about Plaintiff's complaint history. (Doc. 55 at 13–14). It is not contested that Scirghio sent out the notice for the position and asked potential applicants to email him, that Scirghio interviewed candidates for the position,

including Plaintiff, and that after another candidate was selected for the position, Scirghio wrote an email about Plaintiff stating that "it is obvious to me that we made the right choice" in hiring someone else. (Doc. 61-4, Ex. N). A reasonable jury could conclude that Scirghio played some role in deciding whom to hire for the position. Since Scirghio was the subject of the complaints and because a jury could believe Plaintiff when she stated that she complained to him directly, Plaintiff has established a causal connection between her complaints and the loss of her job and has therefore made out her prima facie case.

### b. Legitimate, Non-retaliatory Reasons

Defendant notes that the person hired for the position, Mary Gaskin, had substantially more experience managing people than Plaintiff, and that the new job would require more management experience. (Doc. 56 ¶ 44). To meet its burden in the second step of the *McDonnell Douglas* test, an employer need only "articulate some legitimate, nondiscriminatory reason for the challenged action," and Defendant here has met that burden. *Villiarimo v. Aloha Island Air, Inc.* 281 F.3d 1054, 1062 (9th Cir. 2002).

### c. Pretext

At the third step, the Plaintiff has the burden of demonstrating that the employer's proffered reason is pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang v. University of California Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000). If the evidence of pretext is circumstantial, it must be "specific and substantial in order to create a triable issue." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998). The Ninth Circuit has found "substantial evidence" of pretext when the evidence, viewed in a light most favorable to the Plaintiff, shows that those people involved with the adverse employment decision were "the very people whose actions had prompted [a plaintiff's] complaints." *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989). Here, Plaintiff alleges that she complained to Scirghio directly in addition

to complaining to Callaway about Scirghio.[1] (Doc. 61 ¶¶ 177–183). Callaway acknowledged in her deposition that if Scirghio knew that Plaintiff had complained about her, Scirghio "might say something to her that might increase her stress," or "[i]t might have affected her employment in some way or other." (Doc. 61-2, Ex. A at 145:23-146:21). Although Defendant contests the fact that Plaintiff ever complained to Callaway prior to April of 2008 and asserts that Scirghio played no role in deciding whom to hire, when material issues of fact are found in Plaintiff's favor, Scirghio participated in the decision to hire or terminate Plaintiff while aware that she had filed complaints against him for his inappropriate comments. Such facts would constitute substantial evidence of pretext, and summary judgment on the retaliation claim will be denied.

### 2. Hostile Work Environment

Title VII provides that an employer may not "discriminate against an individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006). A plaintiff may establish a violation of Title VII by proving the discrimination "created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

An employee was subject to a hostile work environment when he or she can show "(1) that he or she was subjected to verbal or physical conduct of a racial or sexual nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison v. Brady*, 924 F.2d 872, 875–76 (9th Cir. 1991). The Ninth Circuit has

---

[1] Plaintiff claims additionally that her EEOC determination constitutes evidence of retaliation. (Doc. 64 at 26). An EEOC determination is "highly probative" of the merits of a complaint. *Plummer v. Western Intern. Hotels Co., Inc.*, 656 F.2d 502, 505 (9th Cir. 1981). Plaintiff's EEOC determination, however, did not involve an allegation that she was retaliated against when Defendant did not hire her for the managerial position, but only addressed whether requiring her to waive the right to sue in exchange for severance was itself retaliatory.

1 cautioned that "where two bases for discrimination exist, they cannot be neatly reduced to
2 distinct components," so Plaintiff's allegations regarding racial and sexual comments must
3 be considered together. *Lam v. University of Hawaii*, 40 F.3d 1551, 1562 (9th Cir. 1994). If
4 an employee experiences a hostile work environment, an employer has an affirmative defense
5 to liability if the employer has "provided a proven, effective mechanism for reporting and
6 resolving complaints of sexual harassment, available to the employee without undue risk or
7 expense," and the employee "failed to avail herself of the employer's preventive or remedial
8 apparatus." *Faragher v. City of Boca Raton*, 524 U.S. 775, 806–07 (1998).

9 Plaintiff alleges that working for Scirghio required enduring a constant barrage of
10 sexually and racially demeaning comments. She claims that the first time she met him,
11 Scirghio stated, "I didn't think [Plaintiff's husband] had a hot little Asian as a wife." (Doc.
12 61 ¶ 175). He advised her to "use her body to market," and asked "so you never flaunt your
13 goods to get in the door?" (*Id.*). He told her that she did not need to exercise because "you
14 look hot already," and asked her to come into his office and fix his phone because "your
15 people are good at computers and phones and things like that." (*Id.*). He referred to her as
16 "China Doll," according to Plaintiff, too many times for her to remember, and stared at her
17 breasts so frequently that she had to tell him to look at her face instead. (*Id.*). He stated that
18 he could "make or break" her career and asked "what she was going to do for him" while
19 leering at her. (*Id.*). Defendant denies that many of these statements were made, and provides
20 evidence to impeach Plaintiff's credibility. (Doc. 55 at 6). At summary judgment, however,
21 "[i]ssues of credibility, including questions of intent, should be left to the jury." *Harris*, 183
22 F.3d at 1051.

23 Scirghio's alleged comments were racial and sexual in nature, and Plaintiff credibly
24 claims that they were unwelcome. The alleged behavior would create "an environment that
25 a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,
26 21 (1993). An objectively reasonable person would find that the comments were not merely
27 "genuine but innocuous differences in the ways men and women routinely interact with
28 members of the same sex and the opposite sex." *Oncale v. Sundowner Offshore Svcs., Inc.*,

1    523 U.S. 75, 81 (1998). Resolving disputed issues in her favor, Plaintiff has shown that she
2    was subjected to a hostile work environment.

3    Nor can Defendant avail itself of the affirmative defense outlined in *Faragher*.
4    Plaintiff does not deny that Defendant had a sexual harassment policy in place, but a
5    reasonable jury could conclude, based on Callaway's deposition testimony and Defendant's
6    response to multiple complaints against Scirghio, that it did not enforce this policy, or in any
7    event did not enforce it with regard to Scirghio. The Court has not considered whether the
8    underlying allegations in the previous complaints are admissible at summary judgment in
9    support of Plaintiff's allegations regarding Scirghio's actions; it has considered these
10   incidents only with regards to how they bear on Defendant's *Faragher* defense. Scirghio was
11   the subject of multiple complaints of sexually inappropriate behavior after Plaintiff was fired,
12   and the record contains no evidence that Defendant took any action beyond issuing warning
13   letters, only to issue further warning letters when the warnings were not heeded.[2]

14   A reasonable jury, moreover, could conclude, based upon Callaway's deposition, that
15   Defendant did not enforce its written sexual harassment policy. Callaway stated that she does
16   not consult written policy but instead works by intuition. (Doc. 61-2, Ex. A at 48). She stated
17   that she believes a hostile work environment is "one in which a person is so distraught
18   that—and distracted by whatever is making the environment hostile that they can't perform
19   their job functions." (*Id.* at 151). The Supreme Court has specifically rejected this argument,
20   noting that "the test is not whether work has been impaired, but whether working conditions
21   have been discriminatorily altered." *Harris*, 510 U.S. at 25 (Scalia, J., concurring). Callaway
22   also stated that she was not aware of whether Defendant had a zero-tolerance policy towards

---

[2] The record contains an "Employee Warning Report" regarding the November 2008 incident. (Doc. 61-3, Ex. K). This "warning" does not mention the previous "warning" which promised that Scirghio would be disciplined for repeating his behavior, and does not state that Scirghio is receiving discipline. The copy is not signed by Scirghio or anyone else; and there is no evidence in the record that the "warning" was actually provided to him.

- 11 -

sexual harassment. (*Id.* at 25–26).³ A reasonable jury could conclude, based on Defendant's handling of the multiple complaints against Scirghio and Callaway's deposition, that Defendant did not offer "a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense." *Faragher*, 524 U.S. at 806. Given the fact that there is a genuine issue of material fact as to whether Defendant fulfilled the first prong of the *Faragher* defense, consideration of the second prong is not necessary. Defendant is denied summary judgment with regards to the hostile work environment claim.

## CONCLUSION

Callaway's declaration does not contradict her deposition. Plaintiff's motion to strike her declaration is denied and the Court considered both the declaration and the deposition in ruling on Defendant's motion.

Plaintiff has stated a prima facie case of retaliation, and Defendant has put forth a legitimate non-discriminatory reason for the adverse employment action. Because a reasonable jury could credit Plaintiff's claims that she complained directly to Scirghio about his behavior, and because a jury could believe that Scirghio was involved in the decision not to hire Plaintiff, genuine issues of material fact remain as to whether the decision not to hire her was pretextual. Moreover, a reasonable person crediting Plaintiff's account of Scirghio's behavior would find that Scirghio's comments created a hostile work environment. Based on Defendant's failure to discipline Scirghio for similar incidents, and Callaway's statements in her deposition that she does not work according to written policy, Defendant cannot avail itself of the *Faragher* defense.

**IT IS THEREFORE ORDERED:**

---

³ Defendant argues that "zero-tolerance policy" is a "vague and undefined term." (Doc. 67 at 3). Plaintiff's attorney greatly reduced any confusion by asking Callaway if she understood the term to mean that "[w]e will not tolerate any sexual harassment, even a little bit is what I mean, zero tolerance, we will absolutely not tolerate discriminatory harassment at work." (Doc. 63-1, Ex. C at 25–26). Callaway stated that she understood that definition and did not know whether Defendant had such a policy. *Id.*

1.   Defendant's Motion for Summary Judgment (Doc. 55) is **denied**.

2.   Plaintiff's Motion to Strike the Declaration of Katherine Callaway (doc. 63) is **denied**.

DATED this 16th day of July, 2012.

_____
G. Murray Snow
United States District Judge