1  **WO**

2

3

4

5

6                  IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9  Kuy Volland,                          )   No. CV-10-02745-PHX-GMS
                                         )
10             Plaintiff,                )   **ORDER**
                                         )
11  vs.                                  )
                                         )
12                                       )
    Mobile Mini, Inc.,                   )
13                                       )
               Defendant.                )
14                                       )
                                         )
15  _____

16          Pending before the Court are Defendant's Motion for Summary Judgment (Doc. 55)

17  and Plaintiff's Motion to Strike the Declaration of Katherine Callaway (Doc. 63). For the

18  reasons stated below, both motions are denied.

19                              **BACKGROUND**

20          Plaintiff, an Asian-American woman, alleges that Defendant, a national publicly-

21  traded company headquartered in Tempe, Arizona that leases and sells portable storage

22  containers and related devices, subjected her to a hostile work environment and retaliated

23  against her when she complained that her supervisor made racially and sexually demeaning

24  remarks. (Doc. 1).

25          On October 8, 2007, Plaintiff began working for Defendant as its National Accounts

26  Manager. (Doc. 56 ¶ 17). She reported to Paul Widner, who was Defendant's Vice President

27  of Sales and Development. (*Id.* ¶ 20). In December of 2007, Nicholas Scirghio replaced

28  Widner as the Vice President of Sales and Development, and Plaintiff then reported to

1    Scirghio. (*Id.* at 21). On December 23, 2005, in response to earlier complaints, Scirghio had

2    been issued a written warning that stated "[a]ny repeated complaints of the above issues will

3    lead to further discipline up to and including suspension, demotion, or termination." (Doc.

4    61-3, Ex. H).

5         In anticipation of acquiring a competitor, Defendant undertook several broad

6    reorganization efforts in early 2008, overseen by Mark Graham, Defendant's Director of

7    Professional Development. (Doc. 56 ¶ 35). As part of the reorganization, Defendant created

8    a National Account Support Center. (*Id.* at 37). In addition, the position of National Accounts

9    Manager, held by Plaintiff, was eliminated, and a new position, National Accounts Support

10   Center Manager, was created. (*Id.* at 38). Graham informed Plaintiff of the changes

11   personally on April 3, 2008, and while Plaintiff took the news calmly, she stated that she did

12   not understand why she was not automatically selected to be the National Accounts Support

13   Center Manager. (*Id.* at 41). On April 8, 2008, Scirghio sent an email to the Branch Managers

14   and the Branch Office Managers, copying Graham, announcing a number of new positions,

15   including the National Account Support Center Manager. (Doc. 56-3, Ex. 7(B)). The email

16   stated that Defendant's preference is to "promote from within," and stated that anyone

17   interested in a position should email Graham or Scirghio. (*Id.*).

18        Plaintiff applied for the position of National Account Support Center Manager; she

19   also approached Katherine Callaway, Defendant's Vice President of Human Resources and

20   Risk Management. (Doc. 56-2, Ex. 2 at 98). According to Callaway, the two met "a couple

21   of times." (*Id.* at 101). During the meetings, Plaintiff expressed her belief that "it was

22   discrimination that [Scirghio] did not have to re-apply for his job but she had to re-apply for

23   her job." (*Id.*). During that meeting or another meeting with Callaway, Plaintiff reported that

24   Steve Bunger, the President and CEO of Defendant, had spoken with Scirghio about Asian

25   reflexology massage, and that Bunger had made a joke about receiving a "happy ending" at

26   the end of the massage. (*Id.* at 107). When meeting with Plaintiff before Plaintiff was

27   interviewed for the position, Callaway "advise[d] her to wait until after her interview to see

28   what happened," rather than make a formal complaint. (*Id.* at 100). Callaway believed that

1  Plaintiff would be hired for the position, and told Plaintiff so. (*Id.* at 102). She acknowledged
2  in her deposition that one reason she did not investigate the allegation that Scirghio had
3  participated in the telling of a racially and sexually offensive joke was that if she did, "[i]t
4  may have affected [Plaintiff]'s employment in some way or another," and that Callaway
5  "really wanted [Plaintiff] to have an unbiased shot at that position." (*Id.* at 146).

6  Plaintiff was interviewed for the position by Scirghio and Graham. (Doc. 55 ¶ 113).
7  Another internal applicant, Mary Gaskin, was interviewed only by Graham. (*Id.* ¶ 114).
8  Gaskin was offered the position of National Account Support Center Manager on April 11,
9  2008. (*Id.* ¶ 130). Plaintiff again met with Callaway, and stated that she believed she had not
10  received the job because Scirghio had retaliated against her, and that Scirghio had engaged
11  in "inappropriate behavior." (Doc. 56-2, Ex. 2 at 109–10). On April 14, Scirghio emailed
12  Plaintiff, asking her to "list for me all the duties you perform in your roll [*sic*]," and
13  requesting that she describe the duties of newly-created positions that would be reporting to
14  Gaskin. (Doc. 61-4, Ex. O). Volland responded, but when asked to train someone hired for
15  the newly-created position, she again approached Callaway. Callaway emailed Scirghio,
16  stating that asking Plaintiff to train Gaskin and those who would report to Gaskin was
17  "belittling" because "on one hand she isn't good enough for the job, but on the other hand
18  you want her to do the job." (Doc. 6-14, Ex. P). Scirghio responded that "it is obvious to me
19  that we made the right choice with Mary just base [*sic*] on [Plaintiff]'s actions over the past
20  few days." (Doc. 61-4, Ex. N). Gaskin herself describes the position that Plaintiff originally
21  held as "the position I pretty much think I took." (Doc. 61-3, Ex. F at 69).

22  Plaintiff was offered a severance agreement on April 16, 2008, which offered her two
23  weeks pay in exchange for a waiver of any claim of discrimination or retaliation. (Doc. 56-3,
24  Ex. 7(E)). Plaintiff declined to sign the agreement and received no severance. (Doc. 56 ¶
25  147–48). Plaintiff filed a charge with the Equal Employment Opportunity Commission
26  ("EEOC") which found on August 31, 2010 that she had been retaliated against by being
27  asked to sign a severance agreement containing unlawful provisions. (Doc. 61-4, Ex M). The
28  EEOC made no finding on any other charge. (*Id.*).

1    In July of 2008, Gaskin complained to Graham that Scirghio regularly engaged in

2  sexual innuendo at work, favored attractive female employees over others, and engaged in

3  otherwise inappropriate behavior at work. (Doc. 61-3, Ex. F at 41). In November of 2008,

4  after Scirghio attended a dinner with a number of employees as part of a team-building

5  exercise, multiple employees complained that he had engaged in inappropriate behavior at

6  the dinner. (Doc. 61-3, Ex. J). Defendant conducted an extensive investigation and a

7  "Memorandum/ Employee Warning Report" was prepared and dated December 18, 2008.

8  (Doc. 61-3, Ex. K). There is no evidence in the record of Scirghio receiving any other

9  discipline based on the December 2008 investigation. (Doc. 61-2, Ex. A at 91).

10    Plaintiff filed this lawsuit on December 20, 2010. When Callaway was deposed, she

11  stated that she did not know whether Defendant had a "zero-tolerance policy" with regard

12  to sexual harassment, that she does not "work by consulting policy" but instead evaluates

13  "the working relationship as a whole and the people within the relationship" and would use

14  her "instinct and my intuition" rather than any written policy to determine whether someone

15  needed to be disciplined. (Doc. 63-1, Ex. C at 26, 48). Subsequently she submitted a

16  declaration that quotes extensively from Defendant's written sexual harassment policy.

17  (Doc.63-1, Ex. A).

18    Defendant has moved for summary judgment on the merits of Plaintiff's suit, and

19  Plaintiff has moved to strike Callaway's declaration. (Docs. 55, 63).

20                                    **DISCUSSION**

21  **I.    Legal Standards**

22          **A.    Motion to Strike**

23    When a party repudiates a previous deposition in a subsequent affidavit, the affidavit

24  testimony cannot be relied upon to "'create' an issue of fact and avoid summary judgment."

25  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). Nevertheless,

26  "[a]ggressive invocation of the rule also threatens to ensnare parties who may simply have

27  been confused during their deposition" and therefore the rule should be applied cautiously.

28  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).

1

### B.    Summary Judgment

2       Summary judgment is appropriate if the evidence, viewed in the light most favorable

3 to the nonmoving party, shows "that there is no genuine issue as to any material fact and that

4 the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Only disputes

5 over facts that might affect the outcome of the suit will preclude the entry of summary

6 judgment, and the disputed evidence must be "such that a reasonable jury could return a

7 verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

8 "[A] party seeking summary judgment always bears the initial responsibility of informing

9 the district court of the basis for its motion, and identifying those portions of [the record]

10 which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*

11 *v. Catrett*, 477 U.S. 317, 323 (1986).

12       "Issues of credibility, including questions of intent, should be left to the jury." *Harris*

13 *v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (citations omitted). *See also Consol. Elec. Co.*

14 *v. United States*, 355 F.2d 437, 438 (9th Cir. 1966) (reversing summary judgment and stating

15 that "[w]hen an issue requires determination of state of mind, it is unusual that disposition

16 may be made by summary judgment"). Because credibility determinations and motive are

17 particularly important considerations in employment discrimination cases, the Ninth Circuit

18 has held that "in the context of employment discrimination, we have emphasized the

19 importance of zealously guarding an employee's right to full trial." *Davis v. Team Elec. Co.*,

20 520 F.3d 1080, 1089 (9th Cir. 2008).

21 ### II.    Analysis

22

### A.    Motion to Strike

23       It is not proper to invoke the sham affidavit rule to strike Callaway's affidavit. The

24 affidavit is not in fact in conflict with Callaway's deposition testimony. The portions of the

25 affidavit to which Plaintiff objects detail Defendant's written anti-discrimination policy. The

26 fact that such a policy exists does not contradict Callaway's statement that she does not work

27 by consulting policy but instead evaluates whether or not one employee has sexually harassed

28 another based on her intuition and instinct. (Doc. 63-1, Ex. C at 26, 48). In her statement of

facts in opposition to Defendant's motion, Plaintiff acknowledges as much, writing that she "admits that [Defendant] has accurately quoted its antidiscrimination policy, but DENIES that [Defendant] actually enforces the policy." (Doc. 61 ¶ 6) (emphasis in original). In evaluating Defendant's summary judgment motion, the Court will rely on all evidence submitted, including Callaway's affidavit and her deposition.

### B.  Summary Judgment

Plaintiff alleges both that she was retaliated against for complaining about Scirghio's behavior and that she was subjected to a hostile work environment. These claims will be addressed in turn.

### 1.  Retaliation

Title VII "prohibits retaliation against an employee 'because [she] has opposed any practice made an unlawful employment practice'" by Title VII. *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1082 (9th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a) (2006)). Retaliation claims are evaluated under the familiar three-part test for Title VII claims established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of retaliation, an employee must show that "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). The Ninth Circuit "has explained that . . . 'the requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th Cir. 2002).

Once an employee establishes a prima facie case, the employer has the burden to put forward "legitimate, non-retaliatory reasons for any adverse actions taken." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464–65 (9th Cir. 1994). If the employer meets this burden, the employee then "has the ultimate burden of showing that [the employer's] proffered reasons are pretextual." *Id.* The plaintiff may do so by presenting either direct evidence or specific and substantial circumstantial evidence that the defendant's reason was

1    a pretext to retaliate against her. *See Villiarimo*, 281 F.3d at 1062; *Godwin v. Hunt Wesson,*
2    *Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

3    **a.   Prima Facie Case**

4        Plaintiff claims that she reported to Callaway in late 2007 and early 2008 that Scirghio
5    had made sexually and racially offensive comments in the workplace, such as repeatedly
6    referring to her as "China Doll," stating that "Asian women are supposed to be submissive,"
7    and suggesting that she should use her looks to advance her career. (Doc. 61 ¶ 175).
8    According to Plaintiff, she made a total of three complaints; first Callaway told her to "brush
9    off" Scirghio's behavior, but ultimately warned her that Plaintiff could lose her job if she
10    continued to complain, and told her that others who had complained about Scirghio had
11    subsequently lost their jobs. (Doc. 61 ¶¶ 178–87). Additionally, she states that she asked
12    Scirghio to stop making such comments on multiple occasions, but that his response was to
13    grin, laugh, or joke. (Doc. 61 ¶ 183). Defendant points to evidence which it claims suggests
14    that Plaintiff did not make these early complaints, but acknowledges that for the purposes of
15    summary judgment, it "accepts as true [Plaintiff's] allegations that she complained" prior to
16    April 2008. (Doc. 55 at 6). Moreover, Callaway denies telling Plaintiff that she could lose
17    her job over complaining, although subsequent discovery has revealed that two earlier
18    women had in fact complained about Scirghio and he had received no punishment other than
19    a written warning. (Doc. 33 at 120:4; 80:9–24).

20        Plaintiff was employed until April of 2008, at which point she was let go and offered
21    severance on the condition that she not file a Title VII complaint. (Doc. 56-3, Ex. 7(E)).
22    Defendants claim that Plaintiff's position was eliminated and replaced with a substantively
23    different position, but the internal candidate who took that position described it as Plaintiff's
24    previous position. (Doc. 61-3 at 69:17–20). Defendant claims that Scirghio played no role
25    in selecting another candidate over Plaintiff for the position, and that the person who did
26    select the other candidate had no way of knowing about Plaintiff's complaint history. (Doc.
27    55 at 13–14). It is not contested that Scirghio sent out the notice for the position and asked
28    potential applicants to email him, that Scirghio interviewed candidates for the position,

1   including Plaintiff, and that after another candidate was selected for the position, Scirghio

2   wrote an email about Plaintiff stating that "it is obvious to me that we made the right choice"

3   in hiring someone else. (Doc. 61-4, Ex. N). A reasonable jury could conclude that Scirghio

4   played some role in deciding whom to hire for the position. Since Scirghio was the subject

5   of the complaints and because a jury could believe Plaintiff when she stated that she

6   complained to him directly, Plaintiff has established a causal connection between her

7   complaints and the loss of her job and has therefore made out her prima facie case.

8                         **b.      Legitimate, Non-retaliatory Reasons**

9          Defendant notes that the person hired for the position, Mary Gaskin, had substantially

10  more experience managing people than Plaintiff, and that the new job would require more

11  management experience. (Doc. 56 ¶ 44). To meet its burden in the second step of the

12  *McDonnell Douglas* test, an employer need only "articulate some legitimate,

13  nondiscriminatory reason for the challenged action," and Defendant here has met that burden.

14  *Villiarimo v. Aloha Island Air, Inc.* 281 F.3d 1054, 1062 (9th Cir. 2002).

15                                  **c.      Pretext**

16         At the third step, the Plaintiff has the burden of demonstrating that the employer's

17  proffered reason is pretextual, "either directly by persuading the court that a discriminatory

18  reason more likely motivated the employer or indirectly by showing that the employer's

19  proffered explanation is unworthy of credence." *Chuang v. University of California Davis*,

20  225 F.3d 1115, 1124 (9th Cir. 2000). If the evidence of pretext is circumstantial, it must be

21  "specific and substantial in order to create a triable issue." *Godwin v. Hunt Wesson, Inc.*, 150

22  F.3d 1217, 1222 (9th Cir. 1998). The Ninth Circuit has found "substantial evidence" of

23  pretext when the evidence, viewed in a light most favorable to the Plaintiff, shows that those

24  people involved with the adverse employment decision were "the very people whose actions

25  had prompted [a plaintiff's] complaints." *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505

26  (9th Cir. 1989). Here, Plaintiff alleges that she complained to Scirghio directly in addition

27

28

to complaining to Callaway about Scirghio.[1] (Doc. 61 ¶¶ 177–183). Callaway acknowledged in her deposition that if Scirghio knew that Plaintiff had complained about her, Scirghio "might say something to her that might increase her stress," or "[i]t might have affected her employment in some way or other." (Doc. 61-2, Ex. A at 145:23-146:21). Although Defendant contests the fact that Plaintiff ever complained to Callaway prior to April of 2008 and asserts that Scirghio played no role in deciding whom to hire, when material issues of fact are found in Plaintiff's favor, Scirghio participated in the decision to hire or terminate Plaintiff while aware that she had filed complaints against him for his inappropriate comments. Such facts would constitute substantial evidence of pretext, and summary judgment on the retaliation claim will be denied.

### 2.    Hostile Work Environment

Title VII provides that an employer may not "discriminate against an individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006). A plaintiff may establish a violation of Title VII by proving the discrimination "created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

An employee was subject to a hostile work environment when he or she can show "(1) that he or she was subjected to verbal or physical conduct of a racial or sexual nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison v. Brady*, 924 F.2d 872, 875–76 (9th Cir. 1991). The Ninth Circuit has

---

[1] Plaintiff claims additionally that her EEOC determination constitutes evidence of retaliation. (Doc. 64 at 26). An EEOC determination is "highly probative" of the merits of a complaint. *Plummer v. Western Intern. Hotels Co., Inc.*, 656 F.2d 502, 505 (9th Cir. 1981). Plaintiff's EEOC determination, however, did not involve an allegation that she was retaliated against when Defendant did not hire her for the managerial position, but only addressed whether requiring her to waive the right to sue in exchange for severance was itself retaliatory.

cautioned that "where two bases for discrimination exist, they cannot be neatly reduced to distinct components," so Plaintiff's allegations regarding racial and sexual comments must be considered together. *Lam v. University of Hawaii*, 40 F.3d 1551, 1562 (9th Cir. 1994). If an employee experiences a hostile work environment, an employer has an affirmative defense to liability if the employer has "provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense," and the employee "failed to avail herself of the employer's preventive or remedial apparatus." *Faragher v. City of Boca Raton*, 524 U.S. 775, 806–07 (1998).

Plaintiff alleges that working for Scirghio required enduring a constant barrage of sexually and racially demeaning comments. She claims that the first time she met him, Scirghio stated, "I didn't think [Plaintiff's husband] had a hot little Asian as a wife." (Doc. 61 ¶ 175). He advised her to "use her body to market," and asked "so you never flaunt your goods to get in the door?" (*Id.*). He told her that she did not need to exercise because "you look hot already," and asked her to come into his office and fix his phone because "your people are good at computers and phones and things like that." (*Id.*). He referred to her as "China Doll," according to Plaintiff, too many times for her to remember, and stared at her breasts so frequently that she had to tell him to look at her face instead. (*Id.*). He stated that he could "make or break" her career and asked "what she was going to do for him" while leering at her. (*Id.*). Defendant denies that many of these statements were made, and provides evidence to impeach Plaintiff's credibility. (Doc. 55 at 6). At summary judgment, however, "[i]ssues of credibility, including questions of intent, should be left to the jury." *Harris*, 183 F.3d at 1051.

Scirghio's alleged comments were racial and sexual in nature, and Plaintiff credibly claims that they were unwelcome. The alleged behavior would create "an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). An objectively reasonable person would find that the comments were not merely "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and the opposite sex." *Oncale v. Sundowner Offshore Svcs., Inc.*,

1   523 U.S. 75, 81 (1998). Resolving disputed issues in her favor, Plaintiff has shown that she

2   was subjected to a hostile work environment.

3        Nor can Defendant avail itself of the affirmative defense outlined in *Faragher*.

4   Plaintiff does not deny that Defendant had a sexual harassment policy in place, but a

5   reasonable jury could conclude, based on Callaway's deposition testimony and Defendant's

6   response to multiple complaints against Scirghio, that it did not enforce this policy, or in any

7   event did not enforce it with regard to Scirghio. The Court has not considered whether the

8   underlying allegations in the previous complaints are admissible at summary judgment in

9   support of Plaintiff's allegations regarding Scirghio's actions; it has considered these

10  incidents only with regards to how they bear on Defendant's *Faragher* defense. Scirghio was

11  the subject of multiple complaints of sexually inappropriate behavior after Plaintiff was fired,

12  and  the record contains no evidence that Defendant took any action beyond issuing warning

13  letters, only to issue further warning letters when the warnings were not heeded.[2]

14       A reasonable jury, moreover, could conclude, based upon Callaway's deposition, that

15  Defendant did not enforce its written sexual harassment policy. Callaway stated that she does

16  not consult written policy but instead works by intuition. (Doc. 61-2, Ex. A at 48). She stated

17  that she believes a hostile work environment is "one in which a person is so distraught

18  that—and distracted by whatever is making the environment hostile that they can't perform

19  their job functions." (*Id.* at 151). The Supreme Court has specifically rejected this argument,

20  noting that "the test is not whether work has been impaired, but whether working conditions

21  have been discriminatorily altered." *Harris*, 510 U.S. at 25 (Scalia, J., concurring). Callaway

22  also stated that she was not aware of whether Defendant had a zero-tolerance policy towards

23

24

25       [2] The record contains an "Employee Warning Report" regarding the November 2008

26  incident. (Doc. 61-3, Ex. K). This "warning" does not mention the previous "warning" which
    promised that Scirghio would be disciplined for repeating his behavior, and does not state

27  that Scirghio is receiving discipline. The copy is not signed by Scirghio or anyone else; and

28  there is no evidence in the record that the "warning" was actually provided to him.

1  sexual harassment. (*Id.* at 25–26).[3] A reasonable jury could conclude, based on Defendant's

2  handling of the multiple complaints against Scirghio and Callaway's deposition, that

3  Defendant did not offer "a proven, effective mechanism for reporting and resolving

4  complaints of sexual harassment, available to the employee without undue risk or expense."

5  *Faragher*, 524 U.S. at 806. Given the fact that there is a genuine issue of material fact as to

6  whether Defendant fulfilled the first prong of the *Faragher* defense, consideration of the

7  second prong is not necessary. Defendant is denied summary judgment with regards to the

8  hostile work environment claim.

9  **CONCLUSION**

10  Callaway's declaration does not contradict her deposition. Plaintiff's motion to strike

11  her declaration is denied and the Court considered both the declaration and the deposition in

12  ruling on Defendant's motion.

13  Plaintiff has stated a prima facie case of retaliation, and Defendant has put forth a

14  legitimate non-discriminatory reason for the adverse employment action. Because a

15  reasonable jury could credit Plaintiff's claims that she complained directly to Scirghio about

16  his behavior, and because a jury could believe that Scirghio was involved in the decision not

17  to hire Plaintiff, genuine issues of material fact remain as to whether the decision not to hire

18  her was pretextual. Moreover, a reasonable person crediting Plaintiff's account of Scirghio's

19  behavior would find that Scirghio's comments created a hostile work environment. Based on

20  Defendant's failure to discipline Scirghio for similar incidents, and Callaway's statements

21  in her deposition that she does not work according to written policy, Defendant cannot avail

22  itself of the *Faragher* defense.

23  **IT IS THEREFORE ORDERED:**

24  ───────────────────

25  [3] Defendant argues that "zero-tolerance policy" is a "vague and undefined term."
26  (Doc. 67 at 3). Plaintiff's attorney greatly reduced any confusion by asking Callaway if she
   understood the term to mean that "[w]e will not tolerate any sexual harassment, even a little
27  bit is what I mean, zero tolerance, we will absolutely not tolerate discriminatory harassment
   at work." (Doc. 63-1, Ex. C at 25–26). Callaway stated that she understood that definition
28  and did not know whether Defendant had such a policy. *Id.*

1.      Defendant's Motion for Summary Judgment (Doc. 55) is **denied**.

2.      Plaintiff's Motion to Strike the Declaration of Katherine Callaway (doc. 63) is **denied**.

DATED this 16th day of July, 2012.

G. Murray Snow
United States District Judge

- 13 -